IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| VINCE HARRIS, as personal representative of the Estate of William Harris III,<br><br>Plaintiff and Counter-Defendant,<br><br>vs.<br><br>JAY HUBBER, and ALIBI BAIL BONDS, LLC,<br><br>Defendants, Third-Party Plaintiffs and Counter-Plaintiffs,<br><br>CITY AND COUNTY OF BUTTE SILVER BOW,<br><br>Defendant and Third-Party Defendant. | CV 24–87–BU–DLC<br><br>ORDER |

Before the Court are Defendant and Third-Party Defendant City and County of Butte-Silver Bow's ("BSB") motions for summary judgment (Docs. 71, 75), and Third-Party Plaintiffs Jay Hubber and Alibi Bail Bonds, LLC's motion to compel (Doc. 80). BSB moves for summary judgment on claims brought by (1) Plaintiffs Vince Harris, as personal representative of the Estate of William Harris III, and Sharon Grantham (collectively, "Harris"), and (2) Third-Party Plaintiffs Jay Hubber and Alibi Bail Bonds, LLC (collectively, "Hubber"). (Docs. 71, 75.) Hubber moves to compel BSB's answers to discovery responses. (Doc. 80.) For the

reasons set forth below, the Court grants BSB's motions for summary judgment and denies Hubber's motion to compel as moot.

## FACTUAL BACKGROUND[1]

In August 2021, David Sandoval was arrested, jailed, and charged with multiple crimes. (Doc. 52 ¶ 4.) Sandoval contracted with Hubber's bail bond business, Alibi Bail Bonds, LLC, to bond him out of jail. (*Id.* ¶ 5.) Hubber was the surety on the bail bond contract; if Sandoval failed to appear in court, Hubber would be liable and Sandoval would be subject to Hubber's complete custody. (*Id.* ¶ 6.)

After Sandoval's release from jail, he failed to appear for his scheduled court hearing. (*Id.* ¶ 7.) Between October and December 2021, four warrants were issued for Sandoval's arrest. (*Id.* ¶¶ 7-9.) On or around December 14, 2021, Butte City Court mailed Hubber notice of Sandoval's bond forfeiture, advising Hubber that he had 90 days to bring Sandoval before the court or remit payment. (*Id.* ¶ 9.)

On December 19, 2021, Hubber was with Jacie Swartz—his friend and fellow bondsman—when he received a phone call informing him that Sandoval was staying at William Harris III's home at 815 South Main Street in Butte. (*Id.* ¶

[1] The facts in this section are derived in large part from the allegations contained in the Second Amended Complaint ("SAC"). (Doc. 52.) To the extent such facts are disputed, the Court treats them as alleged facts included for background purposes only. The Court relies on the Parties' undisputed facts (Docs. 73, 83, 90) for the purpose of resolving the instant motions.

10.) Hubber enlisted Nicholas Jaeger and his brother, Jesse, to assist him with apprehending Sandoval. (*Id.* ¶ 11.) In exchange, Hubber agreed to reduce Jaeger's outstanding bond debt. (*Id.* ¶ 11.)

Around 6:42 p.m., Hubber contacted BSB law enforcement and notified dispatcher Jennifer Bailey that he was planning to revoke Sandoval's bond. (*Id.* ¶ 13.) Bailey initially notified Hubber that no officers were available to assist. (*Id.*) Bailey contacted Sergeant Berger, however, after she recognized Sandoval's name because she knew that Sandoval had multiple felonies. (*Id.* ¶ 14.) Sergeant Berger told Bailey that Hubber was an "idiot" and that law enforcement was not going to get involved, but if Hubber brought Sandoval to jail, officers would serve him with his outstanding warrants. (*Id.*; Doc. 73 ¶ 54.) Bailey communicated this to Hubber and advised that she would clear officers to assist if Hubber got into a struggle. (*Id.*)

Hubber, Jaeger, Jaeger's brother, and Swartz went to Harris's home. (*Id.* ¶¶ 10, 15.) Hubber and Jaeger entered Harris's residence without knocking or identifying themselves. (*Id.* ¶ 15.) They tased Sandoval and a scuffle ensued. (*Id.*) Harris repeatedly instructed Hubber and Jaeger to leave. (*Id.*) At some point, Jaeger grabbed Hubber's handgun, shot Harris twice, and killed him. (*Id.* ¶ 16.)

The State of Montana charged Hubber with aggravated burglary and deliberate homicide by accountability and Jaeger with aggravated burglary and

deliberate homicide. A Butte-Silver Bow County jury convicted Hubber and Jaeger on all charges. (Doc. 73 ¶¶ 80-81.) Hubber appealed his conviction to the Montana Supreme Court, and the court affirmed his conviction during the pendency of the instant motions on September 24, 2026. *State v. Hubber*, 2026 MT 229, 430 Mont. 136, 596 P.3d 1269.

## **PROCEDURAL BACKGROUND**

Plaintiffs initially filed this action in Montana Second Judicial District Court, Silver Bow County (Doc. 7). Crum and Forster Indemnity Company—no longer a party to this case—removed to this Court pursuant to this Court's federal question jurisdiction over Plaintiffs' 42 U.S.C § 1983 claim. (Doc. 1.)

Plaintiffs' Second Amended Complaint asserts the following causes of action against BSB: Negligence (Count III); Negligent Retention/Supervision/Training (Count V); Vicarious Liability (Count VI); and violation of 42 U.S.C. § 1983 (Count VIII). (Doc. 7.) Hubber likewise alleges causes of action against BSB under 42 U.S.C. § 1983 and for Negligence, Equitable Indemnity, and Contribution and Apportionment. (Doc. 14.)

On June 2, 2026, BSB moved for summary judgment on Plaintiffs' claims. (Doc. 71.) BSB filed a second summary judgment motion with respect to Hubber's claims on June 18, 2026. (Doc. 75.) Hubber moved to compel BSB's responses to

discovery on June 24, 2026. (Doc. 80.) All motions are opposed. The Court heard argument on the instant motions on September 29, 2026. (Doc. 107.)

## LEGAL STANDARD

The Court can resolve an issue summarily if the moving party establishes that "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

### I. Whether BSB is entitled to summary judgment on Plaintiffs' claims.

BSB argues that summary judgment is proper because (1) Plaintiffs' negligence claims fail for lack of duty and causation; (2) no legal basis exists to hold BSB vicariously liable for Hubber and Jaeger's actions; and (3) Plaintiffs cannot establish a claim under 42 U.S.C. § 1983 because Hubber was acting as a private individual and not a state actor. (Doc. 72.) The Court will address each argument in turn.

**a. Whether Plaintiffs direct negligence claims against BSB fail as a matter of law.**

To succeed on a negligence claim under Montana law, a plaintiff must prove the following elements: (1) the defendant owed plaintiff a legal duty; (2) defendant breached that duty; (3) the defendant's breach caused plaintiff's injury; and (4) plaintiff suffered damages. *Bassett v. Lamantia*, 2018 MT 119, ¶ 10, 391 Mont. 309, 417 P.3d 299. Whether the defendant owed a legal duty is a question of law for the court's determination. *Id*. Though causation is ordinarily a question of fact, courts may resolve causation as a matter of law where "reasonable minds can reach but one conclusion." *Hubbell v. Gull SCUBA Ctr., LLC*, 2024 MT 247, ¶ 22, 418 Mont. 399, 558 P.3d 1094 (quoting *Riley v. Am. Honda Motor Co*., 259 Mont. 128, 132, 856 P.2d 196, 198 (1993)). Failure to prove any of the four negligence elements is fatal to a plaintiff's entire claim. *Id*., ¶ 11. The Court accordingly addresses BSB's arguments that Plaintiffs' negligence and negligent retention/supervision/training claims fail for lack of duty and/or causation.

**i. Public Duty Doctrine**

BSB first argues that Plaintiffs' negligence claims derive from law enforcement's general duty to protect the public and preserve the peace; therefore, the public duty doctrine bars their claims. (Doc. 72 at 3-4.) Plaintiffs respond that the public duty doctrine does not apply because their claims stem from BSB's affirmative negligent acts. (Doc. 82 at 3.) Plaintiffs contend that BSB law

enforcement negligently encouraged Hubber to enter Harris's home, misrepresented that Hubber had authority to do so, and misrepresented that officers would support Hubber if his apprehension attempt evolved into a struggle. (*Id*. at 6-7.) In the alternative, if the Court finds that the public duty doctrine applies, Plaintiffs argue that BSB had a "special relationship" with Hubber. (*Id*. at 7-8.)

The public duty doctrine bars plaintiffs from holding a government entity liable for injuries resulting from its "breach of a duty owed to the general public rather than to the individual plaintiff." *Gatlin-Johnson v. City of Miles City,* 2012 MT 302, ¶ 14, 367 Mont. 414, 291 P.3d 1129; *see also Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972 ("[I]t has been stated that a duty owed to all is a duty owed to none." (internal quotations omitted)). Law enforcement officers, for example, owe the public a general duty to protect and preserve the peace. *Bassett*, ¶ 11. Officers therefore do "not owe a legal duty to an individual plaintiff where the plaintiff alleges he or she suffered harm from the officer's breach of the general duty to protect and preserve the peace." *Id*. The doctrine prevents courts from excessively interfering with government processes and protects law enforcement's discretion in carrying out their duties. *Id.*, ¶ 12.

The public duty doctrine will not, however, shield a law enforcement officer from liability where a plaintiff's negligence claim is "defined by other generally applicable principles of law," such as where an individual is directly harmed by an

officer's affirmative acts. *Id.*, ¶ 24. For example, in *Bassett*, the Montana Supreme Court held that the public duty doctrine did not bar the plaintiff's negligence claim against a police officer where the plaintiff alleged that the officer injured him by negligently tackling him to the ground. *Id.*, ¶¶ 26-27. The court explained that the officer's duty in that case derived from general principles of negligence and not the officer's general duty to protect the public from harm inflicted by outside sources. *Id.*, ¶ 2.

Plaintiffs argue that the present case is like *Bassett* because their theory of negligence is that BSB law enforcement affirmatively caused Harris's death by misrepresenting Hubber's authority and stating that they would assist in the event of a struggle. (Doc. 82 at 6-7.) The Court disagrees. This case is unlike *Bassett* because officers never interacted with or had contact with Harris. BSB therefore could not have committed affirmative acts that directly harmed Harris. Though Plaintiffs frame their claim as one of affirmative negligence, they are essentially arguing that BSB breached a duty by failing to protect Harris from outside harm inflicted by Hubber and Jaeger. The Court therefore finds that the public duty doctrine applies because Plaintiffs' claims stem from BSB law enforcement's general duty to protect the public and preserve the peace.

An exception to the public duty doctrine arises when an officer and plaintiff have a special relationship that gives "rise to [a] special duty that is more particular

than the duty owed to the public at large." *Nelson*, ¶ 22. A special relationship generally is established:

> (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Id*.

At the hearing on the instant motions, Plaintiffs argued that the first three special relationship exceptions apply. The Court's analysis on the applicability of these exceptions is guided by the Montana Supreme Court's decision in *Eves v. Anaconda-Deer Lodge Cnty*., 2005 MT 157, 327 Mont. 437, 114 P.3d 1037. There, the plaintiff sued the county for wrongful death after her son, Zachary, escaped from the Montana State Hospital and died from cold weather exposure. *Eves*, ¶ 4. Once the Hospital noticed that Zachary was missing, an employee called law enforcement dispatch and asked if officers could locate him. *Id*., ¶ 4. Dispatch declined because officers lacked authority to detain Zachary; however, one officer kept an eye out for Zachary on his routine patrol route. *Id*. Though the plaintiff claimed the county and Zachary had a special relationship under exceptions (2) and (3) to the public duty doctrine, the court rejected this argument, explaining that no special relationship existed because neither the dispatcher nor the officer had any

contact with Zachary. *Id.*, ¶¶ 12-14. The County's actions could therefore not have influenced how Zachary behaved, and Zachary could not have detrimentally relied on its statements. *Id.*

The same is true here. Like in *Eves*, neither Dispatcher Bailey, Sergeant Berger, nor any other member of BSB law enforcement had direct contact with Harris. BSB therefore did not undertake action to protect Harris, and Harris could not have detrimentally relied on its statements. Plaintiffs therefore fail to establish a special relationship under exceptions (2) and (3). Exception (1) is similarly inapplicable. Though Plaintiffs argued at the hearing that the Fourth Amendment's prohibition against illegal searches created a statutory special relationship between BSB and Harris, BSB did not enter Harris's home—Hubber and Jaeger did. The Court therefore finds that none of the special relationship exceptions to the public duty doctrine apply. Plaintiffs' direct negligence claims against BSB fail as a matter of law because BSB owed no duty to Harris.

**ii. Causation**

Though the Court finds that the public duty doctrine bars Plaintiffs' negligence claims, the Court will briefly address BSB's argument that their claims also fail for lack of causation. BSB argues that even if it owed Harris a duty, Hubber, Jaeger, and Harris committed criminal and/or grossly negligent independent, intervening acts that severed the chain of causation. Harris responds

that BSB could have reasonably foreseen the relevant acts and therefore genuine issues of material fact remain regarding causation.

As discussed, causation is an essential element of any negligence claim. *Bassett*, ¶ 10. When a defendant alleges that an independent, intervening cause has severed the chain of causation, courts consider whether (1) "the defendant's negligent act was a cause-in-fact of the plaintiff's injury" and (2) "whether the defendant's act was a proximate cause of the plaintiff's injury." *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 39, 342 Mont. 335, 181 P.3d 601. A plaintiff must show that defendant's breach "foreseeably and substantially caused his injury" to establish proximate cause. *Id.* (internal quotations and citations omitted). Though the plaintiff's specific injury need not be foreseeable, plaintiff must show that defendant "could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff." *Id.*, ¶ 40.

Intentional criminal acts by a third party or grossly negligent acts by the plaintiff may be unforeseeable. *Estate of Strever v. Cline*, 278 Mont. 165, 176, 924 P.2d 66, 672 (1996). A defendant's liability, however, still hinges on whether the defendant might have reasonably foreseen such acts under the circumstances. *Id.* at 178, 924 P.2d at 674. BSB alleges that several criminal and/or grossly negligent acts severed the chain of causation: Harris and Jaeger consumed drugs and alcohol; Hubber brought a defective gun holster to Harris's home and Jaeger gained control

of the gun; Harris approached Jaeger and told him to shoot; and Jaeger shot and killed Harris. (Doc. 72 at 11-12.)

Plaintiffs do not dispute that Hubber was intoxicated from alcohol when he went to Harris's home; Hubber used cocaine and Jaeger used methamphetamine that day; Hubber's gun holster was defective; and Harris approached Jaeger with a beer bottle in one hand and scissors in the other, yelling at them to leave his house. (Doc. 83 at 13-14, 19-23.) At the hearing on the instant motions, Harris admitted that BSB did not know that Hubber and Jaeger were intoxicated or that Jaeger was assisting in Sandoval's bond recovery. Plaintiffs similarly do not dispute that Jaeger obtained Hubber's gun, threatened to shoot Harris, and that Harris replied, "Do it. I don't care. . . . shoot me. Do it." (Doc. 83 at 23.) It is lastly undisputed that a jury convicted Hubber and Jaeger for aggravated burglary and deliberate homicide. (Doc. 83 at 25.)

Based on the above undisputed facts, the Court finds that several criminal and/or grossly negligent intervening acts severed the chain of causation: Hubber consumed alcohol and cocaine prior to apprehending Sandoval; Hubber enlisted Jaeger, who was high on fentanyl, to assist him; Hubber brought a gun to the scene with a defective holster, Jaeger obtained the gun, Harris approached Jaeger and told him to shoot, and Jaeger ultimately shot and killed Harris. BSB, unaware of Hubber's intoxication and Jaeger's involvement, could not have reasonably

foreseen that these acts would occur and ultimately result in Harris's death. Though Plaintiffs claim that Hubber's unlawful entry was foreseeable based on BSB's knowledge of past incidents involving Hubber, this is just one of many criminal acts that severed the chain of causation. On these facts, the Court concludes that reasonable minds could reach only one conclusion: Hubber, Jaeger, and Harris's intervening acts were unforeseeable to BSB and severed any liability it may have had for Harris's death. Accordingly, even if BSB owed a duty to Harris, Plaintiffs' negligence claims fail as a matter of law for lack of causation.

**iii. Vicarious Liability**

Plaintiffs' remaining theory of negligence is that BSB is vicariously liable for Hubber and Jaeger's actions via an agency or independent contractor relationship.[2] (Doc. 52.) BSB claims that it is entitled to summary judgment because it is undisputed that Hubber and Jaeger were acting on behalf of Alibi Bail Bonds when revoking Sandoval's bond and Hubber was not an independent contractor of BSB. (Doc. 72 at 12-14.) Plaintiffs argue that genuine issues of material fact preclude summary judgment regarding BSB and Hubber's

---

[2] Plaintiffs do not dispute that "Hubber was not acting as an employee of any law enforcement agency while attempting to apprehend Sandoval on December 19, 2021." (Doc. 83 at 5.) The Court therefore focuses its analysis on whether vicarious liability may be imposed on BSB via an agency or independent contractor relationship.

relationship. (Doc. 82 at 12-15.) Plaintiffs contend that Hubber and Jaeger were acting as BSB's agents because BSB (1) relied on Hubber to apprehend Sandoval so that officers could arrest him, (2) retained control over Hubber's practices by directing him to contact law enforcement before a bond revocation, and (3) led Jaeger to believe that he was acting on BSB's behalf, thereby creating an ostensible agency relationship. (*Id.*)

Vicarious liability, or *respondeat superior*, "is not a free-standing or independent tort cause of action; rather, it is a Doctrine of the law of agency by which the consequences of one person's actions may be attributed to another person." *Saucier v. McDonald's Rests. of Mont., Inc.*, 2008 MT 63, ¶ 64, 342 Mont. 29, 179 P.3d 481 (citations omitted). Montana law defines an agent as "one who represents another, called the principal, in dealings with third persons." Mont. Code Ann. § 28-10-101. Agency may be actual or ostensible. Mont. Code Ann. § 28-10-103(1). Actual agency is established when the principal employs the agent, and ostensible agency occurs when "the principal intentionally or by want of ordinary care causes a third person to believe another to be the principal's agent when that person is not really employed by the principal." *Id.* All agency relationships require the elements of consent and control. *Dick Irvin, Inc. v. State*, 2013 MT 272, ¶ 49, 372 Mont. 58, 310 P.3d 524. "[A] principal is responsible to third persons for the negligence of the principal's agent in the transaction of the

business of the agency, including wrongful acts committed by the agent as a part of the transaction of business, and for the agent's willful omission to fulfill the obligations of the principal."

Here, Plaintiffs do not dispute that "[a]ll bail recoveries performed by Hubber were done on behalf of Alibi[,]" or that "Nick Jaeger was at Harris' house as a recovery agent for Defendant Alibi Bail Bonds, LLC . . . ." (Doc. 83 at 3-4.) Similarly, it is undisputed that "Hubber was not acting as an employee of any law enforcement agency while attempting to apprehend Sandoval on December 19, 2021." (Doc. 83 at 5.) Though Plaintiffs claim that BSB caused Jaeger to believe that they were acting on BSB's behalf based on a conversation between Dispatcher Bailey and Sergeant Berger, neither Jaeger nor Hubber heard this conversation. Further, because Harris is the third party who suffered injury, Plaintiffs would need to prove that BSB negligently caused *Harris* to believe that Alibi was acting on its behalf. Plaintiffs have produced no evidence on this point. The record therefore does not support Plaintiffs' argument that Hubber and Jaeger were acting as actual or ostensible agents of BSB.

The facts of this case are also distinguishable from cases that Plaintiffs rely on. In *Meigs v. City of Livingston*, 833 F. Supp. 2d 1222 (D. Mont. 2011), Meigs fainted and broke his neck during his arrest and detainment by a City of Livingston police officer. *Id.* at 1224. The court found that a reasonable jury could find that a

City of Livingston police officer was acting on Gallatin County's behalf when he arrested Meigs pursuant to a county-issued warrant commanding "any peace officer in the State of Montana" to arrest Meigs. *Id*. at 1225. The court reasoned that absent this language in Gallatin County's arrest warrant, the officer would have had no authority to arrest Meigs. *Id*. at 1226; *see also Paull v. Park Cnty.,* 2009 MT 321, 352 Mont. 465, 218 P.3d 1198 (concluding that a prisoner transportation company was the State's agent and the State was vicariously liable for Paull's injuries because "[w]ithout some actual or apparent authority derived from the State, [the company] had no basis for shackling Paull, confining him, and transporting him across the country"). Here, Plaintiffs do not dispute that Hubber and Jaeger were acting on behalf of Alibi in furtherance of Hubber's financial interests. (Doc. 83 at 3-4, 9-10.) Although BSB had outstanding arrest warrants for Sandoval, those warrants were directed to "TO ANY POLICE OFFICER OR LAW ENFORCEMENT PERSONNEL." (Docs. 90-15, 90-16.) Hubber's authority to apprehend Sandoval derived from the private bail bond contract between Sandoval and Alibi and Montana law governing surrender of defendants by surety bail bond producers. *See* Mont. Code Ann. § 46-9-510.

The Court now turns to Plaintiffs' argument that BSB may be vicariously liable for Hubber's actions via an independent contractor relationship. An employer is generally not liable for its independent contractor's torts unless one of

the following exceptions applies: "(1) there is a non-delegable duty based on contract; (2) the activity is inherently or intrinsically dangerous; or (3) the general contractor negligently exercises control reserved over a subcontractor's work." *Stricker v. Blaine Cnty.*, 2019 MT 280, ¶ 12, 298 Mont. 43, 453 P.3d 897.

The Parties agree that Hubber owned another company, All Systems Monitoring, LLC, that contracted with BSB to provide pretrial monitoring services. (Doc. 83 at 5-6.) Plaintiffs claim that All Systems Monitoring, LLC, was providing these services for Sandoval when the incident occurred, and that the services provided by All Systems and Alibi overlap when monitoring shows that a supervisee has violated the terms of their GPS unit, thereby prompting a bond forfeiture. (Doc. 83 at 6.) Plaintiffs have produced no evidence, however, that *Alibi* had a contractual relationship with BSB and concede that "[a]ll bail recoveries performed by Hubber were done on behalf of Alibi." (Doc. 83 at 4.) The Parties agree that Sandoval's forfeiture was prompted by his failure to appear in court, (Doc. 83 at 9), and Plaintiffs do not contend that Sandoval violated the terms of his GPS tracking unit. The Court therefore need not address whether any of the above exceptions apply because the prerequisite for liability—that Alibi was an independent contractor for BSB—is not met.

In conclusion, Plaintiffs' vicarious liability claims fail as a matter of law because they have not met their burden to establish a genuine issue of material fact regarding Alibi's relationship to BSB as an agent or independent contractor.

**b. Whether BSB is entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 claim.**

Plaintiffs' Second Amended Complaint alleges that BSB violated 42 U.S.C. § 1983 because Hubber and Jaeger "were acting under color of law when they killed Harris in violation of his constitutionally protected rights and in violation of federal statutes" and that these acts "can be ascribed in part to [BSB's] decision to encourage and authorize the use of Hubber to apprehend David Sandoval. Hubber was jointly engaged with [BSB] and coordinated with them for the apprehension of Sandoval." (Doc. 52 ¶¶ 59-60.) BSB argues that it is entitled to summary judgment because Plaintiffs cannot establish that Hubber and Jaeger were state actors and not acting as private individuals. (Doc. 72 at 15.) Plaintiffs respond that their theory of liability is that BSB was "jointly engaged" with Hubber and Jaeger, and a rational factfinder could find that BSB and Hubber reached an understanding that resulted in the deprivation of Harris's rights. (Doc. 82 at 15-16.)

To establish a claim under § 1983, "a plaintiff must allege that (1) the defendants were acting under color of state law and (2) that their conduct subjected him or caused him to be subjected to a deprivation of some right, privilege, or immunity secured by the Constitution of the United States." *Ouzts v. Maryland*

*Nat'l Ins. Co*., 505 F.2d 547, 550 (9th Cir. 1974). A private party acts "under color of state law" if his or her conduct qualifies as state action under the Fourteenth Amendment. *Briscoe v. Madrid*, 2018 U.S. Dist. LEXIS 162170, *9 (E.D. Cal. 2018).

"[P]urely private conduct, no matter how wrongful, is not within the protective orbit of section 1983." *Id*. (citing *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)). Bail bondsmen are generally not state actors acting under color of state law for purposes of establishing a claim under 42 U.S.C. § 1983. *Id*. at *8-9; *see also Ouzts*, 505 F.2d at 554-55. The *Ouzts* court explained that "the bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice." *Ouzts*, 505 F.2d at 555. It also held that a bondsman does not act under color of state law when their conduct violates state statutes. *Id*. at 552 (explaining that because California law expressly prohibited the bondsman's conduct, their actions could "thus only be described as private conduct attempting the enforcement of a private contract in total defiance of existing state law").

Here, the Parties do not dispute that "Alibi had a financial stake in recovering David Sandoval" (Doc. 83 at 7); specifically, Alibi was at risk of losing $15,000 if it did not timely apprehend Sandoval (*id*. at 10). Further, Plaintiffs' claims in the instant action, in addition to Hubber and Jaeger's criminal

convictions, imply that Hubber and Jaeger violated Montana law when apprehending Sandoval. Under *Ouzts*, Hubber and Jaeger's actions can only be described as purely private conduct attempting the enforcement of Alibi's contract with Sandoval. Plaintiffs' § 1983 claim against BSB therefore fails as a matter of law.

The Court will briefly address Plaintiff's argument that liability under § 1983 attaches because BSB was "jointly engaged" with Hubber. Plaintiffs claim that based on the phone call between law enforcement and Hubber, BSB "induced Hubber to apprehend Sandoval or force him exterior so it could serve its warrants." (Doc. 82 at 16-17.) Private persons who are "jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). This inquiry focuses "on whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity . . . ." *Id.* (citations omitted). "Joint action therefore requires a substantial degree of cooperation[,]" *id.*, and requires more than an isolated event where police agree to "stand by" if trouble arises, *Howerton v. Garcia*, 708 F.2d 380, 384 (9th Cir. 1983).

Plaintiffs rely on one out-of-circuit case for their joint engagement theory. In *McDaniel v. Smith*, 2009 U.S. Dist. LEXIS 90574 (S.D. Ga. 2009), the Georgia Southern District Court found that a genuine issue of fact existed regarding whether a private individual, the guarantor of McDaniel's bail bond agreement, was jointly engaged with the police officer who apprehended McDaniel. *Id*. at *31. There, the guarantor contacted a law enforcement officer, provided the officer McDaniel's location, and requested that the officer apprehend McDaniel and bring him to jail. *Id*. at *29. The present case does not involve the same level of involvement between Hubber and BSB. BSB had no contact with Sandoval or Harris, BSB declined to assist with Hubber's apprehension, and no officers were present at the scene. It is undisputed that Sergeant Berger told Dispatcher Bailey that BSB did not want to deal with Hubber, and when Dispatcher Bailey told Hubber that no officer was available to assist, Hubber replied, "Well, we have it handled. We got it. We don't need them." (Doc. 83 at 16.) Even if BSB agreed to "stand by" in case of trouble and indicated that they would arrest Sandoval if Hubber apprehended him, this conduct does not support a finding that BSB "so far insinuated itself into a position of interdependence" with Hubber that "it must be recognized as a joint participant" in his activity. *Collins*, 878 F.2d at 1154. Plaintiffs therefore have failed to meet their burden of proving that a genuine dispute of material fact exists regarding whether BSB was a joint participant in

Hubber's conduct. Summary judgment is accordingly appropriate on Plaintiffs' § 1983 claim against BSB.

## II. Whether BSB is entitled to summary judgment on Third-Party Plaintiff Hubber's claims.

BSB seeks summary judgment on Hubber's third-party negligence, and § 1983 claims, raising similar arguments as above. (Doc. 75.) BSB contends that because summary judgment is proper and it is not liable to Hubber, it is also entitled to summary judgment on Hubber's claims for equitable indemnity and contribution/apportionment. (*Id.*) The Court analyzes each argument below.

### a. Whether BSB is entitled to summary judgment on Hubber's negligence claim.

BSB again argues that (1) the public duty doctrine bars Hubber's negligence claim and (2) Hubber's intervening criminal acts severed the chain of causation. (Doc. 76 at 11, 15.) Hubber responds that Sandoval's arrest warrants imposed an absolute duty on BSB law enforcement to arrest Sandoval, and BSB's breach of this duty led to Harris's death. (Doc. 89 at 27-30.)

First, applying the legal standards set forth above, the Court finds that the public duty doctrine bars Hubber's claims. As discussed, officers do "not owe a legal duty to an individual plaintiff where the plaintiff alleges he or she suffered harm from the officer's breach of the general duty to protect and preserve the peace." *Bassett*, ¶ 11. In his response brief, Hubber argues that "BSB *had a duty to*

*protect the public* by arresting David Sandoval pursuant to valid arrest warrants, or at least by sending an officer to assist Hubber in that effort," (Doc. 89 at 31) and that "Harris was killed because BSB *breached its duty to the public* to protect or preserve the peace," (*id*. at 33). Because Hubber's claim admittedly stems from BSB's alleged breach of a duty owed to the public and not to Hubber individually, it fails as a matter of law under the public duty doctrine.[3]

The Court next turns to Hubber's argument that Sandoval's warrants imposed an absolute, non-discretionary duty on law enforcement to arrest Sandoval once officers learned of his whereabouts. Though Hubber is correct that the warrants commanded, "David Sandoval shall be arrested within the State of Montana," (Doc. 89 at 28-29), Montana Code Annotated § 46-6-210 (2025) provides that "[a] peace officer *may* arrest a person when the officer has a warrant *commanding* that the person be arrested . . . ." (Emphasis added.) This statute's permissive language undermines Hubber's argument and is consistent with precedent recognizing "[t]he deep-rooted nature of law-enforcement discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 750 (2005) (remarking that under a Colorado statute with similar language, once a judge grants an arrest warrant, "it remains within the discretion of the police whether and when to execute it").

[3] Hubber argues that the Court should declare the public duty doctrine unconstitutional if it bars his claim. The Court will not address this argument.

Montana law thus implies that officers have discretion to determine when and where to make an arrest—even when an arrest warrants commands officers to arrest that individual. The Court therefore rejects Hubber's argument that BSB was legally obligated to assist in Sandoval's arrest.

Finally, even if the public duty doctrine did not bar Hubber's claims, the Court finds that Hubber's and Jaeger's independent criminal or grossly negligent acts severed the chain of causation for the same reasons discussed above. Because Hubber cannot prove either duty or causation as a matter of law, the Court finds BSB is entitled to summary judgment on Hubber's negligence claim.

**b. Whether BSB is entitled to summary judgment on Hubber's 42 U.S.C. § 1983 claim.**

Hubber alleges that BSB, by and through its agents, violated Hubber's equal protection rights by refusing to assist Hubber and treating him differently than other similarly situated bondsman based on its remark that Hubber is "an idiot." (Doc. 14 at ¶¶ 38-40.) Hubber alleges that BSB had the "judicially-ordered, statutory, and common law duties to arrest" Sandoval, and that BSB breached these duties and intentionally discriminated against Hubber by refusing to participate in Sandoval's arrest. (*Id.*) BSB seeks summary judgment on Hubber's § 1983 claim, arguing that it fails as a matter of law on multiple grounds. (Doc 76 at 9-10.) In the alternative, BSB argues that Hubber's § 1983 claim is a collateral attack on his criminal conviction, and it is therefore barred by the United States

Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). (*Id*. at 23-24.) Hubber responds that genuine issues of material fact preclude summary judgment on his equal protection claim and that *Heck* is inapplicable. (Doc. 86 at 21-27, 41-42.)

The Court finds BSB's alternative argument that Hubber's claim fails under *Heck* dispositive.[4] Section 1983 damages actions are inappropriate where a plaintiff's claim requires the plaintiff to prove the unlawfulness of his conviction or confinement. *Heck*, 512 U.S. at 486. When a prisoner brings such a claim, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id*. at 487. If, on the other hand, "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to suit." *Id*.

A Butte Silver-Bow County jury convicted Hubber for aggravated burglary and deliberate homicide by accountability. (Doc. 90 at 53.) The court sentenced

[4] Because the Court finds this alternative argument dispositive, it does not address Hubber's argument that BSB is equitably estopped from defending the merits of Hubber's § 1983 claim by asserting that its decision not to assist Hubber was in part based on a shortage of available officers

Hubber on June 20, 2024, and Hubber is currently serving his sentence. *Id*. Though Hubber appealed his conviction to the Montana Supreme Court, the court issued a ruling affirming his conviction on September 24, 2026, while the present motions were pending. *Hubber*. Because Hubber's conviction has not been invalidated, his damages claim under § 1983 cannot stand if a judgment in his favor would demonstrate the invalidity of his conviction.

Though Hubber argues that the present action is not a collateral attack on his conviction, he alleges in his complaint that he suffered damages because "[h]ad [BSB] . . . performed its duty to arrest David Sandoval or provide assistance to Third-Party Plaintiffs in the arrest of David Sandoval, then Plaintiff William Harris would not have been killed." (Doc. 14 ¶ 39.) It is clear that Hubber's § 1983 claim is an attack on his conviction because he argues that but for BSB's refusal to intervene, Hubber and Jaeger would not have killed Harris. A judgment in Hubber's favor would necessarily imply the invalidity of his conviction. The Court therefore finds that *Heck* bars Hubber's § 1983 claim as a matter of law, and BSB is entitled to summary judgment.

## CONCLUSION

BSB has met its burden of proving that it is entitled to summary judgment on Plaintiffs' claims and Third-Party Plaintiff Hubber's claims. Because Hubber's negligence and 42 U.S.C. § 1983 claims fail as a matter of law, BSB is also entitled

to summary judgment on Hubber's claims for equitable indemnity, contribution, and apportionment. Because the Court finds that summary judgment in favor of BSB is appropriate on the present record, the Court denies Hubber's motion to compel (Doc. 80) as moot.

Accordingly, IT IS ORDERED that Defendant City and County of Butte-Silver Bow's Motion for Summary Judgment Regarding Plaintiffs' Claims (Doc. 71) and its Motion for Summary Judgment Regarding Third-Party Plaintiffs Jay Hubber and Alibi Bail Bonds, LLC's Claims (Doc. 75) are GRANTED.

IT IS FURTHER ORDERED that Third-Party Plaintiffs Jay Hubber and Alibi Bail Bonds, LLC's Motion to Compel Discovery Responses (Doc. 80) is DENIED.

DATED this 19th day of November, 2026.

Dana L. Christensen, District Judge
United States District Court